**2017 BNH 010**          Note:   This is an unreported opinion.  Refer to LBR 1050-1 regarding citation.
_____

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF NEW HAMPSHIRE

In re:                                                          Bk. No. 15-10250-JMD
                                                                Chapter 7
Edward T. Stewart, Jr.,
                   Debtor


Sheila DeWitt &
Joseph DeWitt,
                   Plaintiffs


v.                                                              Adv. No. 15-1032-JMD


Edward T. Stewart, Jr.,
                   Defendant

*Daniel M. Deschenes, Esq.*                    *Nancy H. Michels, Esq.*
*Seth M. Pasakarnis, Esq.*                     *Parnell, Michels & McKay, PLLC*
*Hinckley, Allen & Snyder LLP*                 *Londonderry, NH*
*Concord, NH*                                  *Attorney for the Defendant*
*Attorneys for the Plaintiffs*

## <u>MEMORANDUM OPINION</u>

## I.  INTRODUCTION

Before the Court are the claims of Sheila DeWitt and Joseph DeWitt[1] pursuant to 11

U.S.C. § 523(a)(2)(A) and (a)(6)[2] seeking to except certain debts they allege the debtor,

defendant Edward Stewart[3] owes them from the discharge in this bankruptcy case.  Stewart is the

owner of Data Industries, Inc., which did business as Boardwalk North (BN), a firm that

specialized in home remodeling.  Prepetition, the DeWitts hired BN to carry out a remodeling

---

[1] The Plaintiffs or the DeWitts collectively, or Mr. and Ms. DeWitt, individually.
[2] All further references to "§" or "section" are references to sections of title 11 of the United States Code, the "Code" or "Bankruptcy Code," unless otherwise stated.
[3] The Defendant, the Debtor, or Stewart.

project on their home.  After about a year on the job, and after the DeWitts had paid it over $1,000,000, BN ran out of money and filed for bankruptcy, followed not long after by Stewart himself.  The claims before the Court stem from the course of dealing between the DeWitts, Stewart, and BN—the DeWitts allege that Stewart misrepresented BN's financial condition and misled them into entering into a business relationship, and fraudulently misused the funds they paid to BN.  The DeWitts, accordingly, seek to except their claims against Stewart from discharge.  The Court held a trial on a portion of the Plaintiffs' complaint, including these claims, over the course of five days beginning in February 2017.  After considering the evidence submitted at trial, for the reasons set forth below, the Court will enter judgment in favor of the Defendant on all counts of the complaint.

This Court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(a) and Local Rule 77.4(a) of the United States District Court for the District of New Hampshire.  This is a core proceeding in accordance with 28 U.S.C. § 157(b).  All parties have affirmatively consented to the entry of final orders by this Court.

## II. FACTS

### A. Overview

The procedural background and evidentiary record in this case are both complex and lengthy.  The Court will first address the procedural background, which explains why the Court addresses only two of the thirteen counts of the complaint substantively in this opinion.  Next, the Court will lay out its factual findings based on the evidence presented during the trial.  This evidence comes in five parts: (1) pre-contract events where the DeWitts, Stewart, and the employees of BN came to know each other and negotiate the initial stages of their business relationship; (2) the events relating to the design fee agreement, the agreement in which BN

committed itself to come up with an architectural plan for the DeWitts' home renovation project with an anticipated budget of $700,000 - $1,000,000; (3) evidence relating to the negotiation of the construction contract, where the parties hammered out the detailed construction plan and cost structure of the DeWitts' project; (4) the evidence relating to the performance of the construction contract; and (5) the breakdown of the parties' relationship after BN revealed that it had run out of money and would have to stop work on the project. All told, these events span more than eighteen months between March of 2013 and September of 2014.[4]

The Court admitted a considerable number of exhibits during the trial in this case by agreement of the parties. Many of those exhibits did not feature in testimony and references to them did not appear in the parties' closing briefs. The Court has not made an effort to review this evidence where it is not clearly connected to an exhibit that was explained in testimony. For example, the Plaintiffs provided a copy of the QuickBooks data-file from BN's records as an exhibit;[5] the Court has made no effort to review this exhibit independently. The Court's reasoning is simple. For the Court to wander through the evidentiary record, unguided by testimony or other context from the parties would be to risk making an erroneous factual conclusion due to a lack of context. This risk is particularly serious when it comes to the "email compendium," Ex. 1, a single exhibit consisting of hundreds of emails, with no clear demarcation between them, and not organized in any apparent fashion. Ultimately, the Court has relied on the parties and their counsel to bring all relevant evidence to its attention through testimony or argument.

   *B. Procedural History*

---

[4] The Court's factual findings exclude much of the evidence admitted relating to the parties' veil-piercing arguments. Generally, this evidence related to the financial dealings between Stewart and BN, before BN began its business relationship with the DeWitts. As discussed in detail at § III.A of this opinion, the Court finds this evidence generally irrelevant to its legal conclusions, given that Court has not discussed the veil-piercing arguments in detail.
[5] Ex. 53.

The Court has made several rulings that substantially reduce the number of claims at issue in this proceeding.  The Plaintiffs commenced this adversary proceeding by filing a thirteen count complaint, including seven counts under state law, four § 523(a) counts, and two § 727(a) counts.[6]  After the Court granted the Defendant's motion for summary judgment, only two of the § 523(a) counts remained.[7]  The Court further winnowed the claims under consideration when it issued a pretrial order that deferred the trial on the state law counts, based on jurisdictional concerns.[8]  Finally, during the trial and immediately after the Plaintiffs had rested their case, the Court granted in part the Defendant's motion for judgment on partial findings, disposing of both § 727 counts.[9]  After these rulings, only two counts, the § 523(a)(2)(A) and (a)(6) counts, remained for trial.

### C. Pre-Contract Events

Sometime in late 2012 or early 2013, the DeWitts decided to hire a firm to make substantial renovations and additions to their home.  They planned to turn their home into a dual-purpose residence and community outreach center.  Between them, the Plaintiffs have an extensive educational background, Ms. DeWitt has a PhD in Chemistry and runs a company, while Mr. DeWitt is a high school teacher with degrees in Economics and Divinity.  As might be expected of two educated people about to spend a large sum of money, the DeWitts resolved to vet a number of designers and contractors before selecting one.  This process took them to a New Hampshire Home Builders Association home show in early March 2013.

---

[6] The counts in the complaint are:  (I) Piercing the corporate veil, (II) Breach of contract, (III) Breach of covenant of good faith and fair dealing, (IV) Negligence, (V) Conversion, (VI) Fraudulent misrepresentation and actual fraud, (VII) New Hampshire RSA 358-A, a consumer protection statute, (VIII) § 523(a)(2)(A), (IX) § 523(a)(2)(B), (X) § 523(a)(4), (XI) § 523(a)(6), (XII) § 727(a)(2), and (XIII) § 727(a)(4).  See Doc. No. 14.

[7] See the Court's opinion, DeWitt v. Stewart, 2016 BNH 010 (August 18, 2016) and order of even date.  At that time, the Court deferred entering a final judgment on Counts IX and X; the final judgment entered with this opinion includes these counts.

[8] See Order of November 22, 2016 (Doc. No. 63), scheduling trial on Counts VIII, XI, XII, and XIII and deferring indefinitely the trial on Counts I through VII.

[9] See Order of February 22, 2017 (Doc. No. 75), with the reasoning set forth on the record at the hearing on that same day.

4

There, they first met Stewart, the president and sole owner of BN, a design-build firm.  A design-build firm is one that first comes up with architectural plans for a construction project and then acts as its general contractor.  BN had been in business since 1992, and Stewart as its president had earned various distinctions and accolades, including serving as president of the New Hampshire Home Builders Association and chairman of the Remodeling Council.  Stewart, a self-described entrepreneur and businessman, did not start as a tradesman; as he said it, he "never swung a hammer."  The recession that began in 2008 had an adverse impact on BN.  Stewart and his wife, Linda Stewart—who also worked at BN—testified that around the time Stewart met the DeWitts, they believed things might finally be starting to turn around for the company.  Indeed, the Stewarts had stopped taking salaries in 2008 but resumed taking them in the spring of 2013.[10]

Ms. Stewart also worked at BN as the office manager and bookkeeper.  During the recession, she had begun using personal credit cards to help pay for business expenses.  When she was unable to pay back these bills, she filed a chapter 7 bankruptcy petition in December 2012.[11]  Part of her job as bookkeeper was entering business transactions into QuickBooks, the software program BN used to keep track of its finances.  Ms. Stewart had no formal training in accounting or the use of the program.  She normally entered hundreds of transactions in a week.  Sometimes she made mistakes, and sometimes the software automatically posted entries in unintended categories, resulting in transactions being mislabeled or not labeled at all.  Despite these issues, in her testimony, Ms. Stewart appeared to retain the ability to examine a transaction in the QuickBooks ledger and identify whether it had been mislabeled, and if so, how it ought to have been categorized.  In general, the Court found Ms. Stewart's testimony to be both

---

[10] Ex. 60 at 2.  Stewart receives a paycheck starting April 5, 2013 and Ms. Stewart starting May 13, 2013.
[11] Ex. 31, her bankruptcy petition.

straightforward and credible.  BN's accountant, Peter Pike, testified at trial that Ms. Stewart did a decent job of keeping track of the corporate transactions, although it was by no means perfect. Pike had worked with Ms. Stewart a few times in an effort to improve her use of the software.

Stewart testified that he left the financial side of things to Pike and Ms. Stewart, noting that he was not "very good at it."  So, for example, Stewart would direct Ms. Stewart to pay a specific sub-contractor or vendor and she would write the check and then enter the transaction in QuickBooks.  This system resulted in Stewart not having a detailed conception of the financial trajectory of BN.  This became more clear in Pike's testimony, who when describing his impression of the company's books and records, said that in order to have a reasonable idea about the financial state of the company, someone would have to take a "deep dive" into the financial records and bank statements to reconcile the corporate balance sheet.  Pike acknowledged that this was an expensive proposition that Stewart did not feel BN could bear at the time.  So, Stewart operated with an understanding of the company based on Ms. Stewart's limited bookkeeping skills and his gut feeling about "pipeline sales" or the cash flow from the jobs and potential jobs the company had lined up at a given time.

As is typical for many small business owners, Stewart's personal life was closely wrapped up in the fortunes of the business.  For example, Ms. Stewart testified that in 2008, at the height of the financial downturn, the Stewarts took out a $450,000 line of credit on their personal residence in Salem, New Hampshire, and put approximately $300,000 of the loan proceeds into the business.  The balance of the line of credit went to help pay for a second home in Florida.  Then, again in 2011, the Stewarts took out a line of credit on the Florida home and put the proceeds into the business.  Ms. Stewart testified that BN paid some or all of the interest on these lines of credit since the loan proceeds had been placed into the company.  BN also paid other apparently personal expenses of the Stewarts, especially at the time the Stewarts were not

taking any salary from the company.[12] Ms. Stewart attempted to record these payments as "loan repayments," although she was not always successful. Additionally, just in time for trial, the Stewarts were able to locate copies and originals of promissory notes for the loans. Ms. Stewart would draft the note and make multiple copies of it. Stewart would then sign one of the copies, which would be stored. There were, however, some inconsistencies between copies of the notes, some showing different signature dates and signatures. Due to the inconsistencies, and some missing notes, the documentation about the loans between BN and the Stewarts during the 2013-2014 time period is not complete.[13]

One additional example of how closely tied the Stewarts' personal lives were to the company involves vehicles. Evidence was presented that BN paid for various vehicle expenses. The Stewarts testified that the vehicles were all used in connection with the business. The vehicles included a 2006 Mercedes with 78,000 miles, a 2010 Cadillac financed in June 2014 for $29,000, and several other vehicles.[14]

In the week after the home show, Stewart and the DeWitts met at the DeWitts' residence where they discussed the details of the project for the first time. The DeWitts showed Stewart their conception, embodied in Ex. 202, the "DeWitt Property Renovations." The date on the

---

[12] See Ex. 100, a summary of select bank transfers from the BN operating account to Stewart's personal bank account during 2013 and 2014. Ms. Stewart testified in detail about most of these transactions, explaining their business purpose. Trial testimony, 3/2/2017 at 12:05-12:15. Items 5 and 23 in this summary are erroneous as they refer to dates after BN's bank account was closed.

[13] Other evidence was introduced about the loans between BN and the Stewarts. The Plaintiffs introduced certain QuickBooks reports purporting to show the entire history of the loan transactions between BN and the Stewarts. These reports were generated by the DeWitts, individually, using the QuickBooks program and the BN data file obtained from Stewart in discovery. The DeWitts testified that they had some experience with QuickBooks but neither of them were qualified as experts and neither had any specific experience in financial analysis or forensic accounting, and neither of them had any personal knowledge of BN's record keeping system or business practices. Additionally, various other documents that Ms. Stewart prepared to document loans between BN and the Stewarts were introduced. See Ex. 35. Ms. Stewart testified that these documents were incomplete. One document was an attempt to keep an overall list of the loan between the Stewarts and BN. The exact details of these loan transactions are not relevant to the § 523(a) issues under consideration.

[14] Ex. 63, Schedule B lists both the Mercedes and Cadillac. Ex. 228 contains information about the financing of these vehicles. It is unclear when BN and the Stewarts used all of the vehicles, or whether all of them were still being used during the 2013 and 2014 time period.

bottom of this exhibit shows that it was prepared on February 26, 2013, which is consistent with

the timeline of the home show in early March 2013, and the meeting just described, a week later.

Ex. 202 contains different categories for each area of the house, within which there is a list of

possible renovation ideas.  Many of the ideas have question marks next to them.  Additionally,

the document includes some rough floor plans that are specifically marked with the proviso

"Dimensions for additions TBD – not defined)."  Despite this statement, some of the drawings

do include measurements, although it is unclear how or when the measurements originated.

After meeting with Stewart, the DeWitts selected several companies, including BN, to vet

further before selecting one.  Part of this vetting process included sending an email with a

number of questions to each firm.  In part, the email between the DeWitts, Stewart, and other BN

employees read as follows:

> We are looking forward to meeting with you and the team at 3 pm on Monday.
> Joe has obtained good feedback from several of the references that you provided.
> As part of our evaluation process, could you also provide responses to the
> following questions[?]
>
> 1. What were your annual revenues and number of jobs for 2011 and 2012
> (separated by year)? *Our revenue for 2011, was approx. 2.3m and for 2012, was
> approx. 1.7m [] the recession appears to be cooling down [] our revenues
> through the end of March, this year, are: 1.2m*
>
> 2. What are your revenue projections for 2013 (without DeWitt project)? *We
> projected our revenue based upon historical data will exceed 2.4m and based
> upon the results to date may need to be adjusted to 2.9m, this year, (without your
> project).*[15]

The parties presented extensive testimony regarding this email at trial.  The DeWitts explained

that the purpose behind asking these questions was that they did not want their project to be a

large percentage of the firm's annual revenue.  The Plaintiffs presented BN's federal income tax

---

[15] Ex. 1 at 1.  March 24, 2013 email from Stewart to the DeWitts and others, responding to a March 23, 2013 email from Ms. DeWitt.  The DeWitts' questions are in the regular typeface and Stewart's responses in italics.  In the original exhibit, his responses are in blue.

returns as evidence that Stewart had supplied inaccurate revenue information in the March 24, 2013 email.[16]  BN's federal income tax returns were not filed on a calendar year, but rather on a fiscal year that ran from February through January of the next calendar year.  The Court summarizes this information below and compares it with the Defendant's statements in the email:

| Federal Tax Year | Gross Taxable Income on Federal Tax Return[17] | Revenue Described in Email |
|---|---|---|
| 2011 | $1.94 million | $2.3 million |
| 2012 | $1.65 million | $1.7 million |
| 2013 | $2.47 million | $1.2 million through March 2013 $2.4 - $2.9 million (projected) |

Stewart was examined in depth over the differences between the gross revenue in BN's tax returns and his approximations in the email to the DeWitts.  As to the 2011 and 2012 numbers, Stewart stated that he did not recall exactly what he used to come up with the numbers and that they were approximations, but he ultimately agreed the numbers were not the same.

The 2013 projections require additional background.  Both the Plaintiffs and the Defendant cited to Ex. 87 as evidence that BN had $335,000 in revenue through March 2013.[18]  However, Ex. 87 is based on BN's fiscal year and only shows income from the beginning of February 2013 through the end of March 2013, not income for the first calendar quarter of 2013.  The evidence is insufficient for the Court to determine whether Stewart was talking about BN's fiscal year or the calendar year when he said "our revenues through the end of March, of this year, are 1.2m."  Ex. 1 at 1.  Regarding the 2013 numbers, Stewart explained that he had his

---

[16] Ex. 77 is BN's 2011 federal income tax return dated October 15, 2012.  Ex. 78 is BN's 2012 federal income tax return, dated October 29, 2013.  Ex. 79 is BN's 2013 federal income tax return, dated March 19, 2014.
[17] Approximations from line 1a of Exs. 77, 78, and 79 respectively.
[18] See Pl. Closing Br. at 5, Def. Closing Br. at 14 (Doc. Nos. 91, 99).  This number appears to come from Ex. 87, "exhibit page 3 of 16."

"sales hat on" when he was answering these questions and that he was thinking of "pipeline sales" when he gave the numbers, which he recorded in a "deal book." He did not still have the deal book at trial. The Court understands "pipeline sales" to mean the anticipated cash flow from definite or anticipated contracts BN had with customers.

The DeWitts testified that at some point during these initial meetings they inquired about BN's relationships with its subcontractors. The DeWitts testified that Stewart assured them BN had "excellent" relationships with its subcontractors. Stewart testified that it was possible he said this but did not recall exactly. He testified that BN had "good" relationships with its subcontractors on the whole, during his entire time as president. Brian Lessard, BN's vice president of operations and the individual who was in charge of the DeWitt project, testified that BN had some good and some bad relationships with subcontractors. According to Lessard, some of the relationships with subcontractors were bad because of poor payment history. After exchanging these emails, and some more follow-up[19] the parties entered into the Design Agreement.

   D.  *Design Agreement*

The DeWitts and BN entered into the "Design Fee Purchase Agreement" (the "Design Agreement"), Ex. 2, on April 19, 2013. Broadly, the Design Agreement provided that, for a fee of $2,895, BN would come up with a conceptual drawing using the DeWitts' project goals that could be built for a specific budget. The Design Agreement refers to the budget as the "Anticipated Price Range for this project." That price range was "[f]rom $700k Up to $1,000,000[]"[20] (Not withstanding [sic] any additional parameter changes)." Ex. 2 at 1. Attached to the agreement is a list entitled "DeWitt Design Parameters," which BN had created using the

---

[19] See, e.g., Ex. 1 at 3 – 6.
[20] Ex. 2 actually reads "$700k Up to $1,000,000K." The parties agreed that this number was intended to be "$1,000,000," not $1 billion, and that the "K" was an uncaught error.

"DeWitt Property Renovations" document, Ex. 202.  This attachment has much in common with Ex. 202, but the two are not identical.  For example, the none of the floor plans or pictures are included, the question marks that followed many items are omitted, and there are hand-written notes all over the document, making changes to its substance.  See Ex. 2 at 2-4.  Additionally, the Design Agreement contains a liquidated damages provision in its "Terms and Conditions" section providing BN with the ability to assess "no less than" 8% of the "projected/estimated selling price" in damages if the DeWitts decided to unilaterally withdraw from the agreement.

The DeWitts testified that the $700,000 to $1,000,000 price range was their budget for the project.  Ms. DeWitt testified that "it was all the money they had to spend" on the project.[21] Stewart's testimony was consistent with the DeWitts'; he testified that it was their budget range and not something that he had come up with personally.[22]  The DeWitts claim that Stewart represented to them that BN would "definitely" be able to complete their project, including all of the items listed in the "DeWitt Design Parameters" for an amount within the budgeted range.  In particular, Mr. DeWitt recalled Stewart saying that while it would be closer to $1,000,000, it would "definitely" be under it.  Stewart's testimony differed.

Stewart testified that the DeWitts came to him with the budget and the parameters, which the parties incorporated into the Design Agreement.  Stewart agreed that he was the one who actually wrote the amounts into the document itself.  He said that at the time he had "no idea" that it would be impossible to produce a design for the project including all the items the DeWitts wanted, i.e. the items listed in the "DeWitt Design Parameters" for an amount under

---

[21] Trial testimony, 2/8/2017 at 9:57 a.m.
[22] The DeWitts attempted to impeach this testimony by referring to Stewart's deposition testimony where he had stated that they came up with the anticipated price number in the Design Agreement "together."  Given the DeWitts' testimony that it was their own budget, created with no mention of input from Stewart, the Court finds that the evidence best supports the finding that the budget was the DeWitts' and that Stewart had no part in coming up with this range.

$1,000,000 and could not recall ever having said otherwise.[23]  He further explained that although his team had been to the site and done some measurements, there were simply too many "moving parts" for BN to come up with a firm price so early in the process.[24] The first concept that BN produced came with a price tag of $1,080,000.[25]  Stewart testified that the DeWitts were unhappy with this concept because it did not include all of the items they wanted in the project. The parties continued to meet frequently to work on a design they could all live with. Stewart testified that they met weekly, sometimes twice a week for "hours on end."[26]

### E.  Purchase Agreement and Subsequent Negotiations

Those discussions coalesced in the "Purchase Agreement" dated June 27, 2013.[27]  The full purchase price of this agreement, $1,694,936, came as a shock to the DeWitts despite the fact that, in the discussions leading up to this agreement, the total price had been a central theme. Stewart recalled the DeWitts often asking him where they were in terms of price. In the final weeks he remembered telling them they were "north of $1.4 million."  Shocked as they were, the DeWitts nevertheless signed the Purchase Agreement and let stand the $200,000 deposit—provided a day earlier—pursuant to the Design Agreement.[28]  Indeed, the DeWitts testified that they doubled the required amount of the deposit as a gesture of their own good faith.

In general, the payment scheme of the Purchase Agreement was based on the "start of milestones."  This meant that the agreement obligated the DeWitts to make payments when certain construction activities—milestones—began, not upon the completion of milestones or after a certain amount of progress had been made on a milestone.  This is also evident in that

---

[23] Trial testimony, 2/16/2017 11:03-04 a.m.
[24] Trial testimony, 3/2/2017 at 9:13 a.m.
[25] Trial testimony, 3/2/2017 at 9:33 a.m.
[26] Id.
[27] Ex. 3.
[28] The "terms and conditions" section of the Design Agreement required a 10-15% "good faith deposit" of the $700-$1,000,000 anticipated price range.  Ex. 2.  See Ex. 18 for the deposit itself.

each milestone payment is basically for the same amount: $40,619.05.[29]  Stewart had explained to the DeWitts that the purpose of the milestone payment scheme was for the DeWitts to fund their own project.

Almost immediately, the DeWitts began to have second thoughts given that the $1.6 million contract was so far above their budget.  After discussing the matter for a few days, they called Stewart and told him they wanted to rescind the Purchase Agreement.  Stewart was not surprised.  After the DeWitts signed it, Stewart had told his employees that he thought they would back out of the deal.  The DeWitts did not ultimately end up backing out, however.  The parties continued to negotiate and arrived at a tentative compromise on August 2, 2013, which removed certain features from the project and reduced the purchase price to $1.3 million.[30]  Notably, this new agreement was not an apparent novation but was styled as "C/O #1" or change order 1.[31]

At trial, the DeWitts explained that they did not back out of the deal because they felt trapped by two things.  First, the 8% penalty clause in the Design Agreement, which they believed would have obligated them to pay $80,000 to BN in the event they decided to withdraw.  Despite these concerns, there is no evidence that Stewart ever threatened to impose a penalty to keep the DeWitts from withdrawing or that the DeWitts asked Stewart if he intended to use the penalty clause.  Second, the DeWitts felt obligated to continue to negotiate because they had already provided such a large deposit to BN.  There was no evidence that the DeWitts and Stewart ever discussed the return of the deposit.

---

[29] Ex. 18.  Payments from "start of demo" through "start loam and seed landscaping" are all for the same amount.
[30] Ex. 4 at 25.
[31] Id. at 1.

The DeWitts presented evidence that BN spent a substantial portion of this deposit within days of the Purchase Agreement being signed, before it began work on the project. This evidence took the form of reports generated from QuickBooks showing that the BN checking account had $64,064[32] in it on the day before BN received the $200,000 deposit. The same report shows that BN received an additional $22,442 between June 26 and July 2, 2013. Finally, the report shows that BN then spent $118,900 on expenses unrelated to the DeWitt project during this same period. DeWitts generated these QuickBooks reports themselves for use at trial.[33]

The parties amended the Purchase Agreement again at the end of August 2013. This time they modified it to allow the DeWitts to receive "prepayment discounts" if they paid milestone payments in advance, by some unspecified period of time. This arrangement allowed the DeWitts to receive a 5% discount on a given milestone payment, limited to an aggregate discount of $20,000 for the entire project. Given that the Purchase Agreement did not call for the milestones to occur on any specific schedule, BN would have to let the DeWitts know that it was planning on starting a specific milestone well in advance in order for them to make use of the discount opportunity. The DeWitts testified that Stewart told them the prepayments would allow BN to "leverage" its subcontractors and save BN money. Stewart testified that he believed that BN had used the prepayments to "leverage" subcontractors insofar as the money had been put into the business and helped move the project forward. He was not aware of a situation in which BN had saved money by paying a subcontractor early. Lessard also testified on this topic, concluding that BN had not used the prepayments to "leverage" subcontractors. Lessard never explained what he understood the term "leverage" to mean, however.

---

[32] Ex. 84.
[33] See supra at n. 13.

14

On the same day the parties executed the "discount" version of the Purchase Agreement, August 27, 2013, the DeWitts made another $172,000 good faith deposit and prepaid the first two milestones for the start of demolition and excavation and received the 5% discount on each.[34] The DeWitts made this second deposit at Stewart's request.

### F. Contract Performance

Work on the project began and proceeded slowly. From the outset, Lessard oversaw the project. It is unclear how much of the slowness was due to BN's continuing financial problems, but financial problems appear to have been a factor. For example, Lessard testified that BN had trouble obtaining subcontractors and supplies throughout the project, which caused delays. The DeWitts again testified as to QuickBooks reports they personally generated that BN spent a significant portion of the funds received up to this point on business expenses unrelated to their project. One report purports to show that BN spent $196,392 of the $249,176 BN received at the end of August 2013 on expenses unrelated to the project.[35] Another indicates that within four days of receiving the $77,176 in payments from the DeWitts in September 2013, BN spent $51,410 of the money on items unrelated to the DeWitts' project.[36]

Lessard and Stewart also testified that the DeWitt project was by far the largest and most complex that BN had ever attempted.[37] There is no evidence that either Lessard or Stewart had significant experience in organizing and managing a project the size of the DeWitts'. For

---

[34] Ex. 18. The testimony of the DeWitts and Stewart conflicted as to the purpose of the second good faith deposit. The DeWitts testified that the $172,000 deposit had been necessary to secure the opportunity to get the 5% discounts on milestone payments. Stewart testified that he did not recall the two things being related and simply remembered asking the DeWitts if they would be willing to make a second deposit. The evidence in the record does not resolve this dispute one way or another. There does not appear to be a written agreement that references the $172,000 being related to the discount.

[35] Ex. 85.

[36] Ex. 86.

[37] See Ex. 1 at 38, April 1, 2014 email from Lessard to the DeWitts. In this email, Lessard discusses how much more extensive the DeWitt project was than an "average" BN project. Lessard states the average project with a sale price of $80,000 involved "design time" of ten hours, whereas BN had spent 850 hours of design time on the DeWitt project, as of the date of email.

example, Mr. DeWitt testified that BN went through three different designers before finding one to do the job.

The delays and inefficiencies took their toll on the project and on the DeWitts.  For example, the DeWitt property had both a main living area and a basement guest-apartment area. BN had told the DeWitts that they would be able to stay in the main living area for parts of the project, but in reality the DeWitts had to move into the cramped guest apartment for all but one month of the project.  Additionally, once construction was under way, the DeWitts were plagued by leaks, which resulted in water often pooling in the living areas of the guest apartment in which they were living, and elsewhere throughout the structure.  These are but two examples of the multitude of issues that affected the project from start to finish.

One possible explanation for these problems was the order in which BN carried out phases of the project, which the parties and witnesses referred to as the "sequencing" of various phases of the construction.  Lars Traffie, the CEO of Hutter Construction—the company the DeWitts hired to finish the project after BN ran out of money and was unable to complete the job—testified about the sequencing of the construction work.  He opined that there was no logical, construction-related reason that the work had been done in the order in which BN had carried it out.  For example, floor tile had been put down in certain instances before HVAC work was completed, painting begun before carpentry work was complete, and wallboard installed before electrical work completed.

Stewart testified that this was due to the nature of a remodeling project.  If he was unable to get an HVAC contractor to come to the site on a given day, but did have someone who could put tile down, BN would have the tile put down.  Stewart testified that such practical realities were an inherent difference between the type of work BN did and the type of work that Hutter Construction usually does; Hutter is a large construction company that does many construction

projects, much larger in scope that the DeWitt project, and does not often engage in home-remodeling projects.  Stewart felt that it was better to move a project that was already proceeding slowly forward, than to do nothing.

BN's financial problems continued to worsen over the winter of 2013-2014.  The company laid off a sizeable portion of its staff and was looking to move its office space to a new location to save money.  Additionally, the Stewarts reduced their salaries in the aggregate by $1,500 a week.[38]  In February 2014, Stewart met with Pike, who in addition to providing accounting services, acted as a financial consultant to BN.  Pike testified that the two discussed options such as looking for additional credit, a sale of the business, and a bankruptcy filing.  Stewart testified that he was pursuing all options, including looking for new jobs to keep the company open.  At the same time, however, Stewart was considering reducing his role at the company and having Lessard move to a more prominent position.  As it turned out, none of these things were able to save BN.

In July 2014, BN ran out of cash and was unable to continue working on the DeWitts' project.  Stewart and Lessard personally went to the DeWitts, "hat in hand" in mid-July after a subcontractor placed a mechanic's lien on the project.  Stewart told them that BN had run out of money and would have to cease work on the project for the time being.  The DeWitts, who were only learning about BN's financial problems for the first time, were completely shocked.  Over the winter, spring, and summer of 2014, they had continued to make milestone payments to BN for the work that had been ongoing.  Indeed, the DeWitts had paid BN almost $80,000 in the two weeks before the project ran out of money.  As of July 2014, the DeWitts had paid BN a total of $1,178,245, or about 90% of the contract price, for a project that was 45% complete.[39]  At this

---

[38] Ex. 60 at 3.
[39] Ex. 18 at 27.

time, both Stewart and Lessard testified they still thought that BN would finish the project.  BN

had been through bad times before, and they thought they could make it through this one.

Stewart pursued multiple avenues, including looking to take out a loan for the business and

attempting to borrow the entirety of his personal 401(k) to capitalize the business.  In the end, he

was only able to borrow $50,000 from his 401(k) to put into the company.[40]  This was not

enough, however.  By the end of August 2014, the relationship between Stewart, BN, and the

DeWitts had completely broken down.  Around this time, BN sent an "as-built policy invoice" to

the DeWitts, seeking to recover for unbilled design time that had gone into the project.[41]  The

DeWitts did not pay BN anything on account of this invoice.  Finally, in September of 2014, BN

filed a chapter 7 bankruptcy case; Stewart followed with his own personal filing in February

2015.


## III.  DISCUSSION

Unlike the typical lawsuit, there are no winners in this case.  The DeWitts entered into a

$1.3 million contract with BN for additions and alterations to their home.  Over the course of the

following year, they paid 90% of the contract price and endured major disruptions to their life in

their home.  After that year, only 45% of the work was completed, and BN was out of money,

had ceased work, and filed bankruptcy.  Stewart had lost a company he had owned and operated

for twenty-one years and was in personal bankruptcy.  Before this lawsuit was filed, both sides

had incurred material financial and personal losses.

There is no question that BN breached the Purchase Agreement with the DeWitts.

However, its liability is not the ultimate issue in this case.  The questions before the Court are

---

[40] Exs. 217, 218.
[41] Ex. 11, dated August 15, 2014.  The record is unclear as to when the DeWitts actually received the invoice.

whether Stewart is personally liable for BN's obligations to the DeWitts, whether he has any independent personal liability to them, and, ultimately, whether any such liabilities should be excepted from discharge in his bankruptcy proceeding.

### A. Veil Piercing

As discussed, the DeWitts seek to except from discharge various state-law based tort and contract claims.[42]  They assert the contract claims directly against BN, the counterparty to both the Design Agreement and Purchase Agreement.  The tort claims involve both BN and the Debtor, individually.  At present, there are two questions before the Court: (1) did the Debtor or BN obtain money or property from the DeWitts by false pretenses, false representation, or actual fraud or (2) did the Debtor or BN cause the DeWitts or their property a willful and malicious injury giving rise to damages.  To answer both of these questions fully, the Court must consider whether the Debtor could be personally liable for the actions of BN via a piercing of the corporate veil under New Hampshire law—as the DeWitts argue is appropriate.  In New Hampshire, "courts do not 'hesitate[ ] to disregard the fiction of the corporation' when circumstances would lead to an inequitable result." Terren v. Butler, 134 N.H. 635, 639–40 (1991) (quoting Ashland Lumber Co. v. Hayes, 119 N.H. 440, 441 (1979)).  "[T]he corporate veil may be pierced by finding that the corporate identity has been used to promote an injustice or fraud."  Id. (citing Druding v. Allen, 122 N.H. 823, 827 (1982)).

Given this standard, the Court will assume, without deciding, that the corporate veil has been pierced.  Both the New Hampshire veil-piercing standard and the elements § 523(a)(2)(A) and (a)(6), see below, involve fraud and injustice generally.  Under the specific facts of this case, the Court believes that it would be difficult to find the elements of the § 523(a) claims satisfied

---

[42] Supra at § II.A of this opinion.

but not the elements of the veil-piercing standard.[43]  This assumption allows the Court to cut straight to the heart of the dispute between the parties—if Stewart's debts to the DeWitts are dischargeable, including those that would be imputed to him via veil-piercing—whether the corporate veil should actually be pierced is beside the point.  Accordingly, in the discussion below, the Court shall refer to either the actions of BN or Stewart interchangeably.

### B. Nondischargeability: False Pretenses, False Representation, Actual Fraud

The Plaintiffs argue that much of Stewart's and BN's conduct—from the initial stages of the business relationship, the negotiation of the Design Agreement and Purchase Agreement, and throughout the performance of those contracts—amounted to false pretenses or representations, or actual fraud.  The Court will first set out the legal framework and then address each of these arguments in turn. Section 523(a)(2)(A) provides:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—
> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.]

11 U.S.C. § 523(a)(2)(A).  Plaintiffs seeking to except debts from the discharge must show that their claims come "squarely" within the statutory exceptions, which the Court construes narrowly.  Palmacci v. Umpierrez, 121 F.3d 781, 786 (1st Cir. 1997) (quotation omitted).  The burden of proof on each element is on the Plaintiffs; they must prove each element by a preponderance of the evidence.  Palmacci, 121 F.3d at 787 (citing Grogan v. Garner, 498 U.S. 279, 291 (1991)).  False pretenses and false representation are distinct from actual fraud.  The

---

[43] This does not mean that finding a debt to be nondischargeable pursuant to § 523(a)(2)(A) or (a)(6) would necessarily satisfy the veil-piercing standard in New Hampshire in general; the Court's decision is based on the particular facts of this case.  BN is a closely held corporation with one shareholder who is also the CEO. All the evidence shows that BN was under Stewart's control during the relevant period of time and that he was personally involved in BN's affairs for the duration of its dealings with the DeWitts.

former require an actual misrepresentation, whereas the latter is more generalized.  To establish

nondischargeability by false pretenses or representations, a plaintiff must demonstrate the

existence of each of the following factors:

> 1) the debtor made a knowingly false representation or one made in reckless
> disregard of the truth, 2) the debtor intended to deceive, 3) the debtor intended to
> induce the creditor to rely upon the false statement, 4) the creditor actually relied
> upon the misrepresentation, 5) the creditor's reliance was justifiable,[] and 6) the
> reliance upon the false statement caused damage.

McCrory v. Spigel (In re Spigel), 260 F.3d 27, 32 (1st Cir. 2001) (citing Palmacci, 121 F.2d at

786) (footnote omitted).

> In contrast to false pretenses and false representation:

> "[a]ctual fraud, by definition, consists of any deceit, artifice, trick, or design
> involving direct and active operation of the mind, used to circumvent and cheat
> another...." 4 Collier on Bankruptcy ¶ 523.08[1] [e] (A.N. Resnick & H.J.
> Sommer, eds., 16th ed.2015). This "generic term" has frequently been used to
> "embrace[ ] all the multifarious means which human ingenuity can devise and
> which are resorted to by one individual to gain an advantage over another by false
> suggestions or by the suppression of truth."

Lawson v. Sauer Inc., (In re Lawson), 791 F.3d 214, 219 (1st Cir. 2015), cert. denied 136 S. Ct.

2443 (2016), quoting McClellan v. Cantrell 217 F.3d 890, 893 (7th Cir. 2000).  Actual fraud still

requires "intent to defraud," Lawson, 791 F.3d at 220, but does not require a misrepresentation.

Husky Int'l Elecs., Inc. v. Ritz, 136 S. Ct. 1581 (2016).

The Court addresses the evidence as it relates to the § 523(a)(2)(A) claims in

chronological order, starting with the genesis of the parties' relationship.

(1)  Revenue Emails

The DeWitts argue that the March 24, 2013 email in which Stewart understated BN's

revenue for various years amounts to a false representation which they relied on in entering into

the business relationship with BN.  They conclude that had they known the accurate revenue

numbers, as stated either in BN's federal tax returns or QuickBooks records, they would have

chosen another design-build firm, thereby avoiding the losses BN caused them.  The Court concludes otherwise for two reasons.

First, the Plaintiffs have failed to present sufficient evidence for the Court to find that Stewart intended to deceive the DeWitts with his statements in these emails.  The revenue numbers themselves do not support an inference of an intent to deceive.  These numbers provided were approximations, as Stewart indicates in his answer to Ms. DeWitt's first question.[44]  The Court does not find that the revenue figures Stewart provided are different enough from the gross taxable income amounts for them not to be reasonable approximations.  In addition, there is no evidence that Stewart was specifically aware of the revenue numbers as stated in the 2011 tax returns, or in his company's QuickBooks records.  The 2012 and 2013 tax returns are dated seven and twelve months after the March 24, 2013 email.  These returns do not establish that Stewart had knowledge of their contents in March 2013.  Additionally, Stewart testified that he did not often look at the QuickBooks records.  This testimony is consistent with Stewart's hiring of Pike to get a handle on BN's finances and with Pike's own testimony that Stewart did not have a clear idea about his company's financial picture.  Finally, as the Court discusses below, the QuickBooks reports the Court admitted into evidence were prepared by the Plaintiffs from the data in BN's electronic records.  There was no evidence that any such reports were prepared or used by the Stewarts in the usual course of BN's business.

The projected revenue numbers for 2013 and the actual revenue number through March of 2013 are the most different from the gross taxable income numbers in the federal tax returns. Stewart projected $2.4 - $2.9 million in revenue for 2013, stating that these numbers were without regard to any income that might be derived from the DeWitt project.  The actual amount of BN's gross taxable income for 2013, including the DeWitt project was about $2.4 million.

---

[44] Ex. 1 at 1.

The evidence is insufficient to demonstrate that Stewart was trying to deceive the DeWitts by offering this number.  It is unclear whether Stewart, in March 2013, was yet aware of the amount of revenue the DeWitt project was likely to provide BN for that year, both because there was no actual contract with a specific budget at that time and because it was unclear when the project would start, if ever.  The bare fact that Stewart's projection ended up being incorrect is not enough for the Court to infer that he intended to deceive the DeWitts.  Indeed, Stewart's projection of BN's revenue increasing from 2012 to 2013 is consistent with both his own testimony, Ms. Stewart's testimony, and their actions when they both resumed taking salaries for the first time since 2008 in the spring of 2013.  Stewart's projected revenue number for all of 2013 renders the arguments over the inaccuracy of the "actual" revenue through March 2013 moot.  It is unclear to the Court how falsifying revenue for either two or three months of a year[45] could further a scheme to deceive the DeWitts, when in the answer to the next question, Stewart provided his revenue projection for the full year.  The difference in the numbers themselves is not sufficiently probative to establish intent to deceive by a preponderance of the evidence.

Stewart's explanation that he had his "sales hat" on when answering the revenue questions and came up with the numbers by thinking of "pipeline" sales is plausible when considered in light of the rest of the evidence; his explanation does not support an inference that he intended to deceive the DeWitts.  The evidence shows that Stewart operated BN with only a vague idea of its true financial health.  The evidence also shows that Stewart was not aware of the practical importance of his vague knowledge.  Stewart appears to have equated projected likely "sales," which the Court understands to mean the aggregate prices of likely projects for BN, with revenue.  This is consistent with the Court's understanding of Stewart's role at BN; he

---

[45] It is unclear whether Stewart was referring to the calendar year or BN's fiscal year, which began in February and ran through January of the next calendar year.

was not an expert in the technical aspects of remodeling.  Rather, he was a salesman and entrepreneur who equated success with the amount of sales.[46]

Second, the DeWitts have presented insufficient evidence for the Court to conclude that they actually relied on the revenue emails in making their decision to form a business relationship with BN.  Ms. DeWitt testified that the purpose behind the questions about BN's revenue was so that she and her husband could ensure that their project would not be a significant portion of the selected firm's revenue.  At the time of the March 24, 2013 revenue email, the DeWitts knew the budget for their project was $700,000 to $1,000,000.  This was confirmed when they signed the Design Agreement in April 2013.  The upper range of the budget is a significant portion of the revenue numbers Stewart provided in the email.  One million dollars is almost half or more than half of the historical revenue numbers that Stewart provided.  And, the DeWitts eventually signed the Purchase Agreement for a $1.6 million project, a figure that is an even more significant proportion of BN's revenue.  These facts lead the Court to conclude that the DeWitts essentially disregarded their own due diligence efforts and decided to enter into a contract with a firm for which their project would be a significant undertaking, both in terms of annual revenue and in scope of the work.  Stewart and Lessard both testified that the DeWitt project was the largest BN had undertaken.  The evidence indicates that the DeWitts were aware of this.[47]  Accordingly, the Court finds that the DeWitts have not shown that they actually relied on the revenue numbers Stewart provided in the March 24, 2013 email.

---

[46] The Court does not credit the DeWitts' argument that Stewart "manufactured" the "sales hat" and "pipeline sales" testimony for trial.  The DeWitts attempted to impeach Stewart's testimony by questioning him as to his failure to produce any evidence of a "deal book" in which he recorded his pipeline sales at trial.  Stewart explained that it was just a notebook that he did not keep as a permanent record.  The Court found this to be a reasonable explanation.  Additionally, the Court notes that the DeWitts have the burden to prove that Stewart intended to deceive them, not vice versa.

[47] The DeWitts asked for past client references of BN and in fact followed up with these clients.  The DeWitts met with BN at the BN office many times before entering into a final contract with the company.  The Court simply finds it incredible that the DeWitts were not aware that their project was a significant undertaking for BN.  The DeWitts presented no evidence that BN or Stewart attempted to hide the size and scope of their business from the DeWitts.  Indeed there is evidence to the contrary.  See supra at n. 37.

   (2)    <u>Failure to Disclose General Financial Condition</u>

The DeWitts also argue that Stewart's failure to disclose BN's generally bad financial condition at the onset of the transaction was a false representation.  <u>See</u> <u>Cyr Lumber Co., Inc. v. Raineri (In re Raineri)</u>, 2009 BNH 005, 7 (silence regarding a material fact may be a false representation for § 523(a)(2)(A) purposes).  Here, the DeWitts argue that BN's general financial condition was a material fact based on the type of due diligence questions they had been asking, including the questions about BN's revenue and relationships with its subcontractors.  The DeWitts believe that Stewart's failure to disclose Ms. Stewart's bankruptcy filing, made when she was unable to pay back debts incurred on BN's behalf and its history of paying its subcontractors slowly also constitute material nondisclosures.

In order for Stewart's nondisclosures to be a fraudulent misrepresentation, they must have been material.  Material facts a relying party has the right to know are "those facts touching upon the essence of the transaction" but the debtor is not required to "bare his soul" in discussions with such a party.  <u>In re Osborne</u>, 520 B.R. 861, 869 (Bankr. D.N.M. 2014) (quotation omitted).  The Court finds that the facts the DeWitts argue are material nondisclosures were peripheral background to the transaction, at best.  Despite their arguments, the DeWitts did not ask the type of questions that would have caused the general financial condition of BN to become a central feature of the transaction.  The Court has already found that Stewart's statements in the March 24, 2013 email about BN's revenue did not constitute statements regarding BN's general financial condition.  <u>See</u> <u>DeWitt v. Stewart (In re Stewart)</u>, 2016 BNH 010, 7-9.  The discussion in that prior decision is in accord with the Court's findings in this decision regarding the DeWitts' purpose in sending the emails.  The Court does not see how Ms. Stewart's personal bankruptcy is even arguably related to the essence of the transaction between the DeWitts and BN; nothing in the parties' initial negotiations touched on the Stewarts' personal

financial condition.  Ms. Stewart's use of her personal credit cards to pay BN expenses does not substantially alter the analysis.  Those debts were still her debts, and even if she had some potential claim to recover from BN, her decision to file bankruptcy was a personal one.

Assuming the Court were to find that BN's general financial condition went to the essence of the transaction, the DeWitts still have not proven by a preponderance of the evidence that Stewart intended to defraud them by failing to disclose more financial details.  As the Court has already discussed, during the early stages of the transaction, Stewart appears to have had a credible personal belief that business was turning around for BN.  A belief that business was improving is not consistent with a person who believes his business was going so poorly that he would need to actively conceal it from a customer.

Finally, the Court turns to the issue of relationships with subcontractors.  The DeWitts argue that BN's relationships with its subcontractors were not excellent, as they testified Stewart told them, but rather generally poor due to a history of slow payments.  Lessard, who began working for BN in 2006, testified that BN had paid subcontractors slowly for most of his employment.  He also testified, however, that BN had some good relationships and some bad relationships with subcontractors.  Stewart's testimony was in accord with Lessard's on this point: he felt that relationships with subcontractors were good, but there were exceptions.  In the context of a sales pitch, telling a customer that relationships with subcontractors were "excellent" when in reality the relationships were "good" with some exceptions does not rise to the level of a fraudulent misrepresentation.  Under the circumstances, terms like "excellent" and "good" were both indicative of the general proposition that BN had good working relationships with most of its subcontractors.  There is insufficient evidence in the record for the Court to conclude that this proposition was actually false or that Stewart intended to deceive the DeWitts by using the terms "excellent" and "good" interchangeably.

(3)     Fraud Involving the Design Agreement

The DeWitts argue that Stewart fraudulently induced them to sign the Design Agreement by misrepresenting BN's ability to "definitely" come up with a plan to do the DeWitts' project, with the features they desired, for under $1 million.  They also advance an argument based on actual fraud, pointing to the comparatively low fee in the Design Agreement—under $3,000— designed to get a customer on the hook and the barb of the 8% withdrawal penalty provision to keep them on it, finally leading to the DeWitts being pressured into signing a construction contract for a price well outside their budget.  Stewart argues that he never made a "definite" representation about the cost of the project at this stage and that he had "no idea" that it would be impossible to design a project that would meet the DeWitts' needs for less than $1 million.

The evidence does not support the contention that Stewart intended to defraud the DeWitts with the Design Agreement.  The project was complex from the outset, with many variables.  For example, the DeWitts did not establish that they knew with certainty what features of the project from Ex. 202, the DeWitt Design Parameters, they wanted to include in the project or whether they would be able to afford all of the features.  Rather, the DeWitts came to Stewart and BN with a "wish list" of what they wanted, as represented in Ex. 202, and a budget of $700,000 to $1,000,000.  In the Design Agreement, BN agreed to attempt to design a project with an anticipated price range of the DeWitts' budget which would include the general features set out in Ex. 202.  There was no evidence that either the DeWitts or BN made any attempt to develop estimated costs for the wish list prior to the execution of the Design Agreement.

The Court finds that the "DeWitt Design Parameters" were general for several reasons. First, Ex. 202 has "?"s next to many of the items.  These marks were removed when BN transcribed the DeWitts' parameters onto the attachment to the Design Agreement.  Both the

DeWitts and Stewart testified that BN essentially took the contents of Ex. 202 and copied them into the attachment to the Design Agreement.  There is insufficient evidence to conclude that the features were finalized through this copying process.  Second, the features described in the DeWitt Design Parameters document are general.  For example, in the "Kitchen Area" section, there are parameters like "lots of windows" and "lots of drawers," and in the section "Family Room," one of the parameters is "How to make bigger and brighter[?]"

These facts are more consistent with Stewart's characterization of events than the DeWitts'.  The Court credits Stewart's testimony that he never made any definite representations about cost at the Design Agreement stage.  The indeterminacy of the project parameters made it less likely that Stewart would have even attempted to represent otherwise.  And, even if Stewart had made the representation that the project could be done for less than $1 million, the DeWitts could not have justifiably relied on such a statement, given how uncertain their own project parameters were at this time.  Accordingly, the DeWitts have failed to meet their burden that Stewart made a false representation or that they justifiably relied on any such statement.

Finally, there is no evidence that Stewart or BN intended the Design Agreement to be a generalized scheme to hook the DeWitts into a construction contract based on its fee structure. Stewart testified that he had never actually imposed the 8% fee on a client.  Rather he testified that the point of the fee was to prevent a client from taking BN's designs to another firm. There is no evidence that BN ever threatened to impose the fee on the DeWitts, or that the DeWitts asked if they could back out of the project without incurring the fee.  Indeed, there is no evidence that the parties discussed the fee in any way during their business relationship.  The only evidence relating to the fee was the content of the Design Agreement itself and the DeWitts' testimony that they felt pressured to stay with BN because of the potential of BN imposing the fee.  There was no evidence to show that Stewart intended to create the feeling of pressure to

which the DeWitts testified, or that they were somehow tricked in relation to the cost structure of the Design Agreement.  The DeWitts have not met their burden on actual fraud.

    (4)    <u>Fraud Relating to the Use of Milestone Payment Proceeds</u>

    There are two distinct issues relating to the DeWitts' § 523(a)(2)(A) claims with regard to BN's use of milestone payment proceeds: (1) Stewart's representations that the contract contained the milestone payment structure for the DeWitts to fund their own project, and (2) his representation that BN would use milestone payments paid in advance to "leverage" subcontractors.

    The DeWitts testified that they never would have agreed to make payments in advance of completion of different phases of the project if they had known that BN was using the proceeds of these payments for the general purposes of the business, rather than on their project exclusively.  Stewart testified that he never meant to convey the idea that BN would use the proceeds of the DeWitts' payments exclusively for their project.  Both Stewart and the DeWitts agree that nothing in the Design Agreement or the Purchase Agreement required BN to segregate the proceeds for use with the DeWitt project.[48]

    The evidence is insufficient to find that Stewart's statements about using payment proceeds to fund the project rise to the level of a fraudulent misrepresentation.  The Court cannot conclude that Stewart either intended to convey false information to the DeWitts or to deceive them.  The statements about using the proceeds to fund the project were too general for the Court to conclude that they were false.  There is no dispute that a good portion of the proceeds did go into the project, after all the project was nearly half completed.  The DeWitts were non-specific

---

[48] <u>See</u> Pl. Closing Brief at 32 ("The DeWitts note that Stewart has argued that the construction contract did not expressly require [BN] to keep their project funds separate and distinct.  This contention, while technically true, is irrelevant to the [§] 523(a)(2)(A) analysis where it is represented to the client that the funds were to be used on or for their project.").

about the exact time, place, or circumstances under which Stewart told them that the payments were needed to "fund their own project." The only evidence on this point is that the DeWitts asked Stewart why the Purchase Agreement contained the payment scheme it did. Stewart answered by stating that it was necessary for the DeWitts to fund their own project. The Court finds that it is entirely possible that Stewart was telling the DeWitts that they needed to pay up front because BN did not have the capital to fund the project without payments made at the start of the different phases of the project. This explanation carries an entirely different meaning than if Stewart had told the DeWitts that BN would use the milestone payments exclusively for their project. Under the circumstances, the Court finds it more likely that Stewart was explaining that BN would not be able to perform the project without the milestone payment scheme. This conclusion dovetails with the fee structure of the Purchase Agreement; almost all the payments are in equal amounts even though different phases of the project entailed different costs to complete. Rather than payments being strongly associated with any phase of the project, they are simply spread out relatively evenly.

The DeWitts argue that Stewart's position is belied by BN's actions. They presented QuickBooks reports that tend to show BN used almost half of the DeWitt's initial deposit of $200,000 in July 2013 within a few days of receiving it on costs unrelated to the DeWitt project. At this point, the DeWitts argue they did not even have a final deal with BN, so it should not have used any of the deposit. Stewart argues that they did have a deal, just one that was revised several times in the next two months. The parties signed the Purchase Agreement on June 27, 2013. At this time Stewart testified that he thought the DeWitts would back out of the deal. On June 30, the DeWitts contacted Stewart and told him that they wanted to back out. After that, however, rather than actually back out of the deal, the evidence suggests that the parties agreed to modify the contract, rather than abrogate it. The August 2, 2013 modification is entitled

"Change Order #1" and does not appear to be a novation of the prior agreement.[49]  Accordingly, the Court finds that there was nothing fraudulent about Stewart proceeding under the impression that the parties had a deal and using the deposit.  As the Court has found, Stewart made no representation that the proceeds of the project would be used exclusively for the DeWitt project.

Next, the Court addresses the prepayment deal in which BN allowed the DeWitts to pay milestone payments in advance and receive a discount.  The DeWitts argue that Stewart and BN misrepresented why they were offering the prepayment discount.  Stewart told the DeWitts that the prepayments would allow BN to "leverage subcontractors."  The DeWitts understood this to mean that BN would be able to negotiate a direct discount with subcontractors were it to pay them early.  Stewart explained that what he meant by "leverage" is that it would increase working capital in the business, benefitting BN.  Both Stewart and Lessard testified that they did not think any subcontractor gave BN a discount for a prepayment during the project.

Stewart's statements about "leveraging" subcontractors, either those he made personally to the DeWitts or indirectly in the various emails on the subject are not sufficient to render a debt nondischargeable under § 523(a)(2)(A).  First, there is no evidence that the DeWitts actually relied on the leveraging statements.  The evidence shows that the DeWitts made the prepayments to receive a discount up front.  BN did in fact give them the discount.  There is no evidence that the DeWitts thought they would somehow receive an additional discount if BN was able to "leverage" a subcontractor.  Second, the evidence does not support the conclusion that Stewart intended to mislead the DeWitts when he discussed leveraging subcontractors.  Rather, the Court finds that Stewart was simply providing an explanation of why BN was offering the discount. This finding is consistent with the various emails in which "leveraging" is mentioned.  Whether

---

[49] Ex. 4.

or not the subcontractors were "leveraged," the DeWitts made the prepayments to receive a discount and did actually receive the benefit of that aspect of the contract.

      (5)     <u>Solicitation of Payments at the End of the Project</u>

The Court now addresses the DeWitts' arguments concerning Stewart's and BN's continued solicitation of milestone payments towards the end of the project, when the DeWitts assert Stewart knew or recklessly disregarded the truth that there was no realistic chance for BN to successfully complete the work, while continuing to solicit payments from them. The DeWitts additionally argue that BN was under an obligation to disclose that it had fallen significantly behind on payments to subcontractors and was in danger of having those subcontractors put liens on the project.

To support these arguments, the DeWitts cite to Ex. 62, which is an accounts payable aging summary of vendors owed money for their project as of December 31, 2014, indicating an approximate amount owed of $225,144. The DeWitts also cite to two emails exchanged between BN, an electrician, and a mason. In one of these emails, the electrician is asking for payment on a $28,000 past due bill, on which Stewart says he can only pay $5,000. In the other, the mason sets out the terms on which he is willing to continue to do business with BN, given the large scope of the project.[50] Finally, the DeWitts point to BN's bankruptcy petition as evidence that it had debts too great to even hope that it would be able to finish the project.[51]

This evidence is insufficient for the Court to conclude that Stewart either knew that BN would not be able to complete the project or recklessly disregarded the truth of that fact with an intent to deceive the DeWitts. From Ex. 62, which is as of December 31, 2014, months after the project ended, it is unclear what BN owed during the last months of the project and what came

---

[50] Ex. 1 at 47 and 52-53.
[51] Ex. 55.

due after that time.  It is also unclear what subcontractors were willing to hold off on payments that were past due.  For example, the two emails in Ex. 1 at pages 47 and 52, are both evidence of subcontractors at least willing to work with BN.  This is consistent with the evidence that BN had frequently paid its subcontractors slowly, but nevertheless had continued to do business successfully.  Similarly, the BN bankruptcy petition is a snapshot of debts BN owed on the petition date, but it provides little contextual information for what Stewart knew or recklessly disregarded during the final few months of the project, five or six months earlier.  This evidence, rather than painting a clear picture of a company with no hope as of June and July 2014, is of limited probative value.

On the other hand, the countervailing evidence is compelling.  Stewart and Lessard both testified that they thought they would be able to finish the project, even after they had to inform the DeWitts about a lien on the property and cease work in mid-July 2014.  Stewart's testimony is supported by the surrounding circumstances.  During this period, the evidence indicates that Stewart was making significant efforts to find working capital for the company, through its sale or through a loan.  Finally, in August 2014, Stewart put $50,000 borrowed from his 401(k) retirement account into BN.  Stewart testified that he thought he would be able to put the entire account in, but was limited to $50,000.  The Court finds this cash infusion from an asset that would have been exempt from his personal bankruptcy estate to be significant.[52]  Such a transfer from an exempt asset to a non-exempt asset is not consistent with the state of mind of someone who is acting intentionally or recklessly to deceive.  Indeed, at the point Stewart transferred the 401(k) funds, the DeWitts were already aware of BN's financial plight, and Stewart continued to act with what the Court believes to be an honest intent to save the business.  See Palmacci, 121 F.3d at 789 ("The focus, however, should be on whether the surrounding circumstances or the

---

[52] § 522.

debtor's actions appear so inconsistent with [his] self-serving statement of intent that the proof leads the court to disbelieve the debtor.") (quotation omitted).

Lessard's testimony that he thought the project would be finished was also credible. This finding is significant. To the Court, Lessard's testimony was fairly transparent. There were times when he clearly struggled with what he felt was BN's ill-treatment of the DeWitts. There were other times when Lessard seemed like he was presenting a more rosy picture of the facts than he actually believed. His testimony about the project being finished was devoid of such apparent hedging; when Lessard testified that he thought the project would be finished until the day BN closed its doors, his testimony was straightforward and believable. For these reasons, the Court concludes that Stewart did not intend to deceive the DeWitts into tendering payments during the final months of the project.

(6)     Overall Course of Dealing

So as not to run the risk of missing the forest for the trees, the Court will now discuss the parties' course of dealing as a whole—in a case such as this, with an extensive evidentiary record and many discrete claims, a survey of each claim in isolation could prevent the Court from seeing the overall picture. The DeWitts argue that their entire course of dealing with BN was an actual fraudulent scheme in which Stewart and BN acted to extract money from them which Stewart used to support his "lavish" lifestyle and keep his business running, all without serious intent to finish their project. The DeWitts point to various specific facts which they argue support their story.

First, they argue that Stewart presented an image of BN as a thriving company during the time the DeWitts were vetting different contractors. Then, Stewart locked them into a deal using the Design Agreement, containing an onerous penalty clause, while at the same time intentionally hiding how much the project would cost. After getting them on the hook, the

DeWitts argue that Stewart revealed the true price of the contract, but only once they had tendered a $200,000 deposit.  Stewart then used his possession of the deposit, the penalty clause of the Design Agreement, and his own personality to pressure the DeWitts into staying in the deal, albeit for a reduced price.  The DeWitts continue, arguing that during this time, Stewart immediately began to use their money on anything he wanted, evincing the intent he had harbored all along.  Once the project was under way, the DeWitts argue that Stewart directed Lessard to start various phases of the project, out of any logical sequence, solely for the purpose of triggering the DeWitts' obligation to make milestone payments under the Purchase Agreement.  Additionally, the DeWitts claim that Stewart intentionally used substandard materials to save BN money, without telling the DeWitts.  Once this this scheme was fully underway, the DeWitts testified, Stewart announced to them that he was retiring, abandoned the project, and never returned until July 2014, when he revealed the company ran out of money.  During this second phase of the project, the DeWitts argue that Stewart did essentially nothing to ensure its successful completion.

The evidence does not support the DeWitts' overall narrative.  As discussed above, the evidence that Stewart or the DeWitts made BN's general financial condition a central issue was too limited for the Court to find that Stewart misled the DeWitts.[53]  The DeWitts appeared to be primarily concerned over the size of their project relative to the size of the company they were hiring, not the company's past financial performance.  Next, the Court believes that the evidence insufficient to find that Stewart used the Design Agreement as the hook of some larger fraudulent scheme.  There is no evidence that Stewart was actually aware of the likely cost for the project at the time the parties were entering into the agreement.  As the Court has found, the DeWitt Design Parameters were too general at that phase.  Additionally, the evidence showed

---

[53] § III.B(1) and (2) of this opinion.

that BN had not undertaken a project the size of the DeWitts', so it is not surprising that Stewart would not have had an accurate sense of its true cost.  And again, although the DeWitts attempt to make the liquidated damages provision of the Design Agreement a central issue now, there is no evidence that it was a central issue at the time the Purchase Agreement was being negotiated.

As to BN's overall use of the proceeds of the DeWitts' payments on the project, the evidence does not support a finding that Stewart made any specific representations that BN would use the proceeds exclusively on the project.  The Purchase Agreement is silent on this subject and the payment structure is divided into equal amounts, rather than being tied to the actual cost to complete various phases of the project.  Based on these findings, the Court finds no basis to conclude that BN's use of funds was part of a fraudulent scheme.

Nor does it appear that Stewart was using BN funds for any kind of self-dealing scheme.  Rather, the evidence shows that he had not taken a salary from 2008 until the spring of 2013 and that he eventually reduced that salary by the next spring when the company's financial condition worsened.  The DeWitts presented no evidence of any significant spending of BN's funds on the Stewarts' personal expenses during the relevant time period.[54]  For example, the DeWitts point to a $40,000 transfer from the BN business account to Stewart's personal account on September 10, 2013, around the time BN was beginning the DeWitts' project.  Ms. Stewart provided a detailed and plausible explanation of this transfer in two parts.  First, she explained that $20,000 of the transfer had been a loan repayment to Stewart.  Substantial evidence was presented that Stewart had loaned BN money over the years.  Much of this evidence was confused due to the incomplete QuickBooks records, separate documents created to track the loans, and a confusing system of tracking promissory notes on these loans.  With all of those caveats, the Court finds the evidence sufficient to conclude that this $20,000 transfer is not probative of Stewart's

---

[54] Cf. n. 12.

fraudulent intent.  Stewart and BN made routine, if sloppy, efforts to document the loan transactions and repayments, making them seem genuine; this was not a one-off, undocumented transfer or one of a general pattern of undocumented transfers.  Second, Ms. Stewart credibly explained that the remaining $20,000 of the transfer was her effort to set aside funds to pay bills that were coming due.  She testified that this was her routine practice, given that money left in the main corporate account was liable to be spent by accident.  This conduct may be evidence of poor financial practices by BN—consistent with Pike's testimony—but does not establish that Stewart was siphoning funds for personal use.[55]

The DeWitts also point to Stewart's ownership of a vacation home in Florida and luxury-brand cars as evidence that the Stewarts were living high at the DeWitts' expense.  The factual evidence demonstrates otherwise.  The Stewarts do indeed have a vacation home in Florida, but the evidence supported Stewart's claim that proceeds of a home equity loan on the Florida home had been used to aid BN.  As to the cars, one of the vehicles is a 2006 Mercedes, seven years old during the events in question, and the other a 2010 Cadillac that was financed in June 2014—the Court is not persuaded that this amounts to evidence of a luxurious lifestyle.

Additionally, the evidence does not support the conclusion that BN fraudulently sequenced the project for the purpose of forcing the DeWitts to make additional payments on the project.  Rather, the evidence shows that the DeWitts consistently were willing to make substantial prepayments on the project, even before milestone payments were required, to obtain a discount.  The DeWitts make much of Lessard's testimony that Stewart directed him to start certain milestones to "keep the business moving forward."  Stewart, however, offered an

---

[55] In their brief, the DeWitts also argue that Stewart spent 185 hours of employee time on renovations for his home office.  There was no significant testimony on this subject, and the exhibit containing this information, Ex. 101, is just a summary of time spent and lacks any indication of the expense involved.  Given the lack of context, the Court does not find this probative of actual fraud on Stewart's part.

explanation that was plausible based on the totality of the evidence: when BN was unable to get a subcontractor, for whatever reason, they would start work on some other part of the project so that something could be done. Traffie, of Hutter Construction, the company the DeWitts hired to finish the project after BN was off the job, testified that there was no valid reason for BN to have done the job in the sequence it did, based on accepted practice in the construction industry.[56] The Court accepts Traffie's conclusion on this point, but finds it not inconsistent with Stewart's explanation. Essentially, the Court understands that the project was behind schedule, BN was having trouble getting subcontractors to the site due to financial trouble, mismanagement, or both, and that rather than do nothing, Stewart wanted to make some progress, even if it was not advisable from a construction practice perspective.[57] The standard applicable is not whether BN or Stewart always acted in the best interests of the DeWitts. The standard is whether Stewart acted to intentionally deceive the DeWitts. Based on the preponderance of the evidence, the Court cannot conclude that he did. The DeWitts presented only a few specific instances where work was done out of order, for example, a vent in the kitchen was tiled over, or wallboard installed before electrical wiring put in behind it. What is not clear is (1) the extent of such issues or (2) that these were intentional rather than negligent actions; the lack of clarity on both of these issues prevents the Court from making a finding that Stewart acted with the requisite intent.

---

[56] After offering this opinion, Plaintiff's counsel asked Traffie why in his opinion BN sequenced the project in the way it did, in light of the payment scheme in the Purchase Agreement. Traffie reasoned that BN started different parts of the project to cause new milestone payments to become due. The Court does not give much weight to this part of Traffie's testimony. Traffie offered a speculative conclusion based on limited personal knowledge of all the facts: his review of the construction contracts involved and his review of the job site. While this background certainly qualifies Traffie to opine about the technical aspects of the work done on site, it does not give him any special insight into Stewart's state of mind.

[57] Lessard testified that he did not think that the sequencing of the project had always been in the DeWitts' best interests.

The DeWitts also argued that Stewart intentionally used construction materials of a lesser quality than that called for in the construction contract as a way to save money at the DeWitts' expense.  The only evidence presented on this subject was Mr. DeWitt's testimony that at the end of the BN's tenure on the project, he examined the grade of the exposed lumber that was not covered behind walls and found that it was of a lesser standard.  This evidence, without more, is not enough for the Court to conclude this was part of an intentional scheme on BN's part.[58]  Mr. DeWitt has no special knowledge about construction materials and it is unclear how representative his brief survey was of the other materials that BN used on the project.

At this point, the Court will address generally the evidence presented in the form of QuickBooks reports that the DeWitts prepared and introduced.  The DeWitts point to this evidence as indicative of BN's use of project funds from beginning to end, of the Stewarts' personal transactions with BN, and of BN's cash flow and profit and loss on the DeWitts' project.  The DeWitts testified that they received and indeed included as an exhibit, the raw QuickBooks data file from BN, which they personally reviewed and used to generate reports to submit as evidence in this case.  Both of the DeWitts testified that they had prior personal experience with QuickBooks.  They did not testify that they had any personal knowledge of BN's record-keeping system or specific use of the program.  Armed with the data and the program, the DeWitts personally generated, possibly with the assistance of counsel, the QuickBooks reports, summaries, and statements presented as evidence at trial.  For several reasons, the Court views all of these exhibits with a healthy dose of skepticism and does not accord them with the full weight they may have had if either a qualified expert testified to them

---

[58] In their closing brief, the DeWitts cite to Ex. 103 at 14-18, a portion of their answers to the Defendant's interrogatories during discovery, as additional evidence of substandard materials.  The Court affords this evidence little weight.  General responses to an interrogatory without any testimonial context does not amount to evidence sufficiently probative to affect the Court's decision.

or had they been prepared by an individual with personal knowledge of how the records were used in practice at BN.  The Court does view these exhibits as what they are: prepared personally by the Plaintiffs for use at trial to support their allegations in the complaint.[59]  They are more argument than evidence.

The other testimonial evidence in the case confirms that the Court is right to view the QuickBooks reports with skepticism.  Ms. Stewart in particular testified in detail about some of the reports.  It was clear from her testimony that such reports and account records were far from perfect.  It was also clear that the simple reports and records are difficult to interpret without assistance from the person who routinely kept the records:  Ms. Stewart.  Although she testified about some of the records, this testimony did not provide the Court with sufficient context that the records were presented in the way they would have been used in the ordinary course of business for BN, or that they had not been cherry-picked for their persuasive value.  Ms. Stewart did not testify as to all the records, but rather mostly about the records which the DeWitts found indicative of improper personal transactions between BN and the Stewarts, most of which occurred before the DeWitts did business with BN, and thus are irrelevant to determining whether BN or Stewart intended to defraud the DeWitts.

Next, the Court addresses the part of the DeWitts' narrative in which they claim Stewart retired in November 2013 and abandoned the project, demonstrating that he had falsely represented that he would personally run the project, and that he viewed the DeWitts as a means for his company to generate revenue with no real interest in completing the project.  Even if Stewart did tell the DeWitts that he intended to retire, the Court does not see how such an

---

[59] The inclusion in the record of the raw bank account statements for all the relevant accounts is of little help to the Court.  See Ex. 115.  Only very limited testimony was presented using these records on very specific points.  The Court is unable to parse such bank records without any context in a manner that would be sufficiently reliable for use in the making of findings of fact.

announcement would support a finding of actual fraud.  The rest of the evidence shows that Stewart did not retire, but continued to work.  There is some evidence indicating that Stewart wanted to retire, for example Pike's notes, and Stewart's own testimony.  The DeWitts complain that Stewart was not present on the project site from after his retirement announcement until the end of the project, something at odds with Stewart's representation to them that he would personally oversee the project at the outset.  The trouble with this argument is that the Court cannot find any support in the record for the contention that the parties ever intended for Stewart to be the one running the project, day-to-day.  It seems that from the outset Lessard was the DeWitts' main contact.[60]  This makes sense, as Lessard had more practical trade knowledge than Stewart.  There is also evidence that the lead site carpenter served as a contact for the DeWitts at times.  There is no evidence that Stewart was ever consistently present on the site once construction began, rather he made occasional visits.  The Court cannot conclude that Stewart's retirement announcement, even if it occurred as the DeWitts described, was part of any actual fraudulent scheme.

At base, the Court concludes that the overall course of dealing is not indicative of actual fraud.  The evidence is insufficient for the Court to conclude it more likely than not that Stewart devised a complex scheme to draw in the DeWitts, using their payment stream as revenue to keep his business propped up and feed his personal spending habit.  Rather, the evidence shows that Stewart and BN made a serious effort to complete the DeWitts' project but were hampered

---

[60] The DeWitts repeatedly cite to Ex. 1 at 3, an email dated March 27, 2013 from Stewart to the DeWitts, as evidence that the DeWitts did not want Lessard running the project and had insisted that Stewart oversee everything personally.  The Court does not find this email probative of such a conclusion.  Rather, in the email Stewart proposes moving Lessard out of the "production manager" position and into a "sales/estimator/administrative" position, leaving the "lead carpenter" as the "daily ambassador" to the project and offering an interview with the lead carpenter.  On the next page of the exhibit, Ms. DeWitt responds to Stewart's proposal saying that they don't need to interview a lead carpenter and would just prefer to meet the potential "leads" after any decision to hire BN.  This is email is evidence of preliminary discussions relating to the project, before any of the contracts had been signed, and not indicative of any actual agreements between the parties.

by insufficient working capital from the start.  Stewart made increasingly desperate attempts to

save the business, perhaps objectively destined to fail, but efforts that he subjectively thought

had a chance to succeed at the time.  Some of these efforts, such as using borrowed 401(k) funds

to capitalize BN, were voluntary and contrary to his personal financial interests.[61]  For these

reasons, the Court concludes that any liability Stewart owes to the DeWitts should not be

excepted from discharge pursuant to § 523(a)(2)(A).

### C.  Nondischargeability:  Willful and Malicious Injury

The Court next addresses the § 523(a)(6) claims.  Section 523(a)(6) of the Bankruptcy

Code excepts from discharge any debt "for willful and malicious injury by the debtor to another

entity or to the property of another entity."  The statute requires a separate showing for

willfulness, malice, injury, causation, and damages.  The burden of proof is the same as the

Court set out above with regard to § 523(a)(2)(A).  A malicious injury is one committed

wrongfully and "without just cause or excuse, even in the absence of personal hatred, spite or ill-

will" and committed in "conscious disregard of one's duties." Printy v. Dean Witter Reynolds,

Inc., 110 F.3d 853, 859 (1st Cir.1997) (quotation omitted).  On the other hand, "[w]illfulness

requires 'a showing of intent to injure or at least of intent to do an act which the debtor is

substantially certain will lead to the injury in question.'"  In re Levasseur, 737 F.3d 814, 818–19

(1st Cir. 2013) (quoting In re Neronha, 344 B.R. 229, 231 (Bankr. D. Mass. 2006)).  Here, the

---

[61] The DeWitts also point to the "as-built policy invoice," Ex. 11, as evidence of Stewart's intent to actually defraud the DeWitts.  The DeWitts see this invoice as an attempt of BN to collect amounts from them not contractually due, essentially a surprise attack.  Yet, the other evidence shows that the amount of design time BN had spent on the project had been an ongoing concern to BN.  See Ex. 1 at 38, April 1, 2014 email from Lessard to the DeWitts.  The Court does not find the as-built policy invoice to be material to this dispute.  First, the DeWitts never paid anything to BN because of the invoice.  Second, the invoice was sent at the end of August 2014, after work had ceased on the project.  Given this timing the Court does not find it relevant to the overall course of dealing, but rather a symptom of a business relationship that had deteriorated significantly.

injury the DeWitts seek redress from is the financial and property damage they suffered when BN failed to complete the project.[62]

In discussing the § 523(a)(6) claim, the Court focuses on the willfulness requirement. Throughout the previous section of this opinion, the Court discussed how the evidence was insufficient to conclude that Stewart harbored fraudulent intent in many specific instances and in general through his entire course of conduct. Given those findings, the Court has no trouble concluding that Stewart lacked the intent required to find willfulness. For example, there is no evidence that Stewart set out at the beginning of the parties' relationship substantially certain that the DeWitt project would fail, ruining his business in the process, resulting in the financial harm the DeWitts suffered. Likewise, there is no evidence that Stewart ever became substantially certain he would cause the DeWitts injury by continuing to work on the project and continuing to solicit payments from them. The DeWitts argue that the work completed out of sequence is demonstrative of an intent to injure. But, as the Court found above, the evidence regarding construction sequencing was insufficient for the Court to conclude that the improper sequencing was the result of Stewart's intention, rather than either mismanagement or negligence. In the end, the Court believes that Stewart thought he was doing what was necessary to finish the project, even if those actions ended up being outright misguided or wrong, given the outcome.

Additionally, for the reasons the Court set out above, the financial evidence was insufficient for the Court to conclude that there was ever a time that Stewart was subjectively certain that the project was going to fail and that the DeWitts would be injured if he did not cease work immediately. Rather, Stewart's actions, including putting $50,000 of his retirement fund into his business, even after revealing BN's financial trouble to the DeWitts, is indicative of his subjective belief that he could save the company and finish the project. For these reasons, the

---

[62] See Pl. Closing Br. at 42.

Court concludes that the DeWitts have not demonstrated that Stewart or BN intended a willful and malicious injury to the DeWitts or their property.  Accordingly, any liability Stewart owes to the DeWitts should not be excepted from discharge pursuant to § 523(a)(6).

## IV.  CONCLUSION

For the reasons set forth above, the Court finds in favor of the Defendant on Count VIII pursuant to § 523(a)(2)(A) and Count XI pursuant to § 523(a)(6).  As a result of this ruling and the Court's rulings on the Debtor's Motion for Summary Judgment and Motion for Judgment on Partial Findings,[63] the DeWitts' claims against the Defendant will be dischargeable.  These rulings also render the DeWitts' claims in Counts I-VII moot, as they are claims for damages against the Debtor that are dischargeable.  In the context of a fully administered chapter 7 case, there is no further relief that the Court may afford the DeWitts as creditors of the bankruptcy estate.[64]  Accordingly, the Court will enter a separate final judgment in favor of the Defendant on all counts.  This opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

ENTERED at Manchester, New Hampshire.


Date:   August 18, 2017                    /s/ J. Michael Deasy
                                           J. Michael Deasy
                                           Bankruptcy Judge

---

[63] _Supra_ at n. 7 and 9, respectively.
[64] _See_ Bk. No. 15-10250-JMD, Doc. No. 93, the Chapter 7 Trustee's Final Account.